It's number 10 dash 2 6 8 7 people versus Jose Carrizales. Good morning, your honors. Tomas Gonzalez on behalf of the appellant Jose Carrizales. Begins with authority, this weight effort. You know what? Since there's only one case today, it's pretty informal. When he comes up, he can tell us his name. And at that time, I'm sure we'll guess that he represents the state. Well, may it please the court and Tom Gonzalez on behalf of the appellant Jose Carrizales. Jose Carrizales was denied a fair trial where the court replaced juror Cachon with alternate juror Boone after three and a half hours of deliberations without delving deeper into the necessity of this particular jury replacement procedure. In Roberts, the Illinois Supreme Court acknowledged that a substitution process like the one that took place here involves a substantial risk or prejudice. Thus, while the juror replacement after the case has been submitted for deliberations is not prohibited, reversal is required where it actually causes prejudice to the defendant. Can you tell me what the prejudice is in this case, Mr. Gonzalez? What do you think the prejudice is? I think there's three main points and then maybe a couple of sub points beyond that. But I think one of the biggest ones is the difference in the time of deliberations before the replacement procedure and the time of deliberations after. And what can you extrapolate from that? Well, I think I can extrapolate a couple of things. One is because on the front end, again, three and a half hours, there was lots of evidence here. There was a lot of moving parts here. It was somewhat complex in terms of who was relating what story and at what time. And so we have a whole host of evidence to go through. We have the initial, the original jury, spends three and a half hours deliberating, forming opinions and all that. Then this juror, Cachon, just kind of out of nowhere, there's an indication that she's having this alleged language problem. So what happens after that is the court calls her out and really doesn't do any delving beyond just accepting her word that she had a language problem. Well, what does the judge do? If the juror says, you'd probably be back here on the appeal saying, well, she said to him that she didn't understand English and he forced her to listen to the case anyway. I mean, if the juror says, I do not understand, I'm not comfortable with the language, English is my second language and I don't feel I'm getting everything that's being said, and the court inquires into that and makes a determination that, you know, this juror is telling the truth or better safe than sorry, whatever his reasoning may be, how do we, you know, many months after the fact, sitting here say, well, that judge was One of the main problems is that the court should have inquired of that jury. In other words, here's what I think is alarming. There was no indication of a language problem during the initial pre-trial period. During all of that selection, there was none of that whatsoever. Then we have three days, at least three days of trial, not including that initial jury selection process. Again, no indication. But it still brings us back to my original question. How does the court determine whether this juror is telling the truth or not telling the truth if the juror is clearly a person that has English as their second language and she says, I really don't feel comfortable that I am getting all of it. How would the court completely, you know, just disavow that assertion by the juror and say, well, I think you have to continue to sit on this case anyway. Would that be proper? Well, if let's say the verdeer had taken place and the court had followed up and said, well, what happened? How come you didn't raise this earlier? What happened during the initial verdeer? What happened during three days of trial? Why after three and a half hours are you just now bringing this up? And then let's just, whatever she gives some satisfactory answer that the court accepts. We still have the other options that indicate prejudice. And that is besides... So in other words, no matter what this juror said, it would be prejudice. Is that your position? I mean, it sounds like you're saying that the court should have inquired, but even had the court inquired, it wouldn't matter what the juror said because prejudice would have accrued anyway. Well, that's right. And there was a couple other factors. And your initial question was directed to that. And I think beyond that, then again, as far as the three and a half hours before, the jury is instructed to start anew, but they only deliberate for an hour and a half afterwards. That's a pretty wide discrepancy. And while there was a presumption that the courts follow or that the jury follows instructions, we maintain that the post-trial interviews suggest otherwise and plainly show otherwise. This isn't, I know the state makes much about the principle that under Hobley we're not allowed to impeach the jury, but that's not what this is. But what he's suggesting is the remedy, though. He's suggesting the judge should have declared a mistrial and one of the jurors said I don't understand perhaps the technical terms used in the verdict forms or what? Well, again, I think given the fact that she just related this three days of trial, after having plenty of opportunity for this alleged language problem to, it suggests a couple of things. I mean, it seems pretty farfetched. Along the same line, let's say, as we know, the jury came out an hour and a half or so later with a verdict. Are you saying the judge should have parked them back in the jury room and said no, that's not long enough? No, I'm not saying that. I guess I'm saying that a mistrial should have been declared as soon as it was discovered that wow, three and a half hours and we're just now bringing this up. I mean, it seems pretty farfetched that somehow this would just surface. I mean, I think the more likely scenario is that this was a heavy gang case and a lot of gang theme and it's no mystery that sometimes jurors are skittish about reaching a verdict or maybe signing a verdict form. I think you're really reaching into speculation and conjecture there, counsel. Well, I mean, it's... I mean, that's not even in part of your interviews, is that right, with the jurors? No, but I think what the interviews, again, what they go towards showing is not so much, it definitely has nothing to do with impeaching the verdict. It's about showing the prejudice from the jury. And it's evidenced by, it's a pretty wide discrepancy. We're not talking about three hours versus two hours, you know, two and a half hours versus two hours and 45 minutes. We have these interviews that say flat out, well, yeah, it shows that while they may have been instructed, Robert says that one thing that the courts can consider is whether or not the jury followed those instructions. Well, how else is that shown? I mean, it's one thing to have a party should be allowed to rebut that presumption. And our position is that that's what these interviews go towards doing. Can you compare this case to Hayes? People versus Hayes. Well, it does have some parallel. It has parallel only to the extent that Hayes involved the juror with the language problem. I don't think there was, in that case, there wasn't the indication. We didn't have the discrepancy. Or the post-trial interviews like we do here. I think this is a much, a more compelling case in that respect. Putting aside the post-trial interviews, because I don't think the post-trial interviews as the trial court, I don't think they showed anything. And I don't know that they are necessarily supportive of your argument that a mistrial should be declared. But putting aside all of that, don't you think Hayes and this and what the court did and what the appellate court said is, you know, is the necessary fix if the trial court erred? Compare Hayes for me to this. Because I basically think that Hayes is pretty much on point with this. I mean, that's what it sounds like to me. So tell me why I'm wrong. Well, I acknowledge that there, again, there are parallels. And, you know, the most obvious one, of course, is we had a jury replacement based on a stated language problem. But I think what's more significant here is, again, we have this time frame of three and a half hours to deliberations after three days of trial, after much earlier opportunity. What's the prejudice? That's the key here. You've got to show that the defendant was prejudiced. So can you zero in on that for me in your argument? Yes. Okay. Well, aside from what I've already addressed as far as the difference in time, both before and after. We know that there was a three hours, over three hours, 20 minutes or something in the first one and an hour and a half in the second. Okay. What else constitutes prejudice? Okay. Then I've already referred to the post-trial interviews, which I think definitely demonstrates prejudice. The fact that the jury... How so? Talk about that. Because it rebuts the presumption that the jury followed instructions. I mean, we acknowledge that the jury was instructed to deliberate anew. But these post-trial interviews show or belie that notion. Specifically how? Well, because it's, again, it's, they indicate that, and this to me explains the time difference. It actually elucidates that discrepancy. They basically indicate, well, we were pretty much made up, we solidified, I think is the word they used, we solidified our opinions. It was at the one juror mentioned filling in the blanks. Even the replacement juror, Boone, said something along the same line. And I think it's unrealistic to assume that, you know, that jurors had not made up their minds or at least formulated some opinions after three and a half deliberations. I mean, that's presumably why they were instructed to disregard any previously formulated opinions. But I maintain that these post-trial interviews belies the notion that they did follow instructions. Well, following that reasoning, these cases that say that submission to the jury is not the determining factor in whether or not an alternate can be used, you just throw those out the window and say, well, once the case has been submitted to the jury, you can never use an alternate. That's what you're saying, because, you know, human beings are human beings. Certainly the judge had instructed them, and I think everybody in the record certainly supports that. But you're saying that that doesn't matter. You believe that they deliberated anyway and that they'd come to a conclusion regardless of what they said and regardless of what the court said. I mean, how do we know that? That's the problem for us. You know, if we do what you want, we have to write something and it has to make sense. Okay? And what you're telling me is that it doesn't matter whether or not the judge instructed them, as long as the jury started deliberating, you can never substitute an alternate. That's what you're saying, and that is not what the case law says. No, and with all due respect, that's actually not what I'm saying. In a sense, yes, you didn't say it in those words, but that's what it means. I think what I'm saying is that perhaps there's a bit of a gap in the law, because, again, I acknowledge that Robert says that it's not prohibited, and we have no problem with that. I accept that. Okay? But there should be, I guess, something more. In other words, the Roberts court recognized the high risk for prejudice here, so that there should be something more, more of a verdier with all 12 of the reconstituted jury. None of that took place here. It was basically just a simple admonishment to start anew without delving into further details, such as, you know, were any votes taken? What kind of opinions were formulated? Was there any particular breakdown? Don't you think that the judge would then be vastly interfering with the jury deliberation by doing something like that? In a way, you're sort of calling for the judge to inquire into the jurors in such a way that they're going to start revealing what's going on before they've reached the verdict. Well, and I know a lot of this is a matter of degree, and I'm not, I guess I'm not prepared to, you know, formulate some kind of bullet point as far as that goes, but I guess what I'm suggesting is that it should be something more than just a simple, okay, deliberate anew, or disregard your old opinions. Because, especially after three and a half hours, I think that's pretty extraordinary set of circumstances where, again, after this many days of trial, after all of the earlier opportunity, it seems to me... When you distill the trial down, though... I'm sorry? When you distill the trial down, there's about two key witnesses, all right, in terms of the occurrence. Yeah, as far as the occurrence, that's right. And couldn't a rational explanation be the reason it took them three hours to get to that point was because that one juror was being, was having that difficulty, and they finally came to the realization that she couldn't meaningfully participate? Well, here's the other thing. One of those alternate, or one of the jury on the interview mentioned she had no trouble communicating during the course of the trial. And, yeah, assuming that they followed the instruction to not deliberate or talk about the case while it was ongoing, certainly they would talk and exchange pleasantries and whatnot during the course of the trial. And this juror in particular said she had no apparent language problem throughout the duration of the trial. But counsel, there's a difference between what are we having for lunch and beyond a reasonable doubt instructions. That might have been where the barrier was. Yeah, I guess I've just... Why would it take three and a half hours? I guess that's the thing I think for it to come out for the first time. Here's the reason, here's part of the problem with the speculation. Just as what Justice Delort just said, that's as reasonable an explanation as the one that you're giving, that the jury, the juror was so confounded by the nuances of the language when it related to the evidence, as opposed to are we going to a coffee break or what are we having for lunch, that it really took longer because Ms. Chacon was not able to grasp the language. That is as reasonable an explanation as the one that you're offering. And it's back to what I asked you earlier, which is what are you asking us to do? And I think Justice Delort asked that question. What is the remedy that you're seeking? Well, the bottom line is... What do you think that the trial court could or should have done? Well, first, again, I think that the trial court should have delved into asking more questions, almost something that resembles more of an initial frontier, maybe perhaps without... And you would have been satisfied with that if the trial court had asked more questions? Well, we're talking certainly about a process that would avoid what we have here, what the affidavits reveal took place here, which is kind of a streamlining of earlier deliberations, a streamlining. Okay. Maybe I'm just... Can we just step back a moment? When you say voir dire, your initial argument was that there should have been more of a voir dire about whether or not this juror understood English or understood the process. And you are now saying that, suggesting that another type of voir dire should have occurred regarding deliberations? Oh, no. I misspoke, or if I'm misunderstood, no. You were talking about voir dire as to how far along they were, had there been any votes. Where did you anticipate that type of voir dire to occur? Well, at the point where it first came to light that this juror was having a language problem. So you want that voir dire to establish whether or not that juror should be excused as part of that analysis? Sure. In other words, why not call her when there's this indication again? And maybe that's why I would agree that in a lot of circumstances that the fact that she's having a language problem would certainly be a reasonable explanation. But I think what makes it less reasonable is, again, that it took place after three days of trial, after a much earlier opportunity to broach it, and to just raise it for the first time after it just seems a little more far-fetched. You're questioning the basis for excusing the juror. Well, tell me about what happened there. Did the judge preclude the attorneys from asking questions? No, they did not. So there was an opportunity? There was, but I guess our position is that the court, you know... Either party to have raised these? Yeah, no, there was. There was opportunity. So it's not all on the trial judge? But to the extent that it's not broached, again, with this potential for prejudice and the courts being duty-bound to ensure a fair trial, I guess what I'm asking, you talk about the four tiers, which is simply ask why this didn't come out much sooner? You know, some basic questions like that, you know, not getting so far along where you're getting into specifics about who formulated what opinion or that type of thing, but something beyond just, oh, you have a language problem, okay, you're excused and calling the alternate juror after three and a half hours who's already in Schomburg and all of that. I mean, I think that's what's most extraordinary about this case. So something just beyond what took place here, just asking her why this didn't come out in pre-trial for a year, asking her why it just never came out, you know, during the three days of trial or even sooner into the delivery, it just seems pretty extraordinary. And... Well, I think even if we agree with you that it's irregular, and I think the court in both Henderson and Hayes talked about irregularity in some of these proceedings in terms of when an alternate is used, but you still have to show prejudice. And that's where I am encouraging you to really highlight your strongest points as to what constitutes the prejudice other than, and you've made a good argument about the three hours versus the hour and a half, but what else? I mean, is that the crux of your argument, that that shows prejudice? Well, no, that's one of them. That's one of them. Okay, get together two pretty fast because you're running out of time. It's the only case today, so we're not strict clock watchers, but move it along if you can. Okay, I'll just take it right down the line. Okay, again, the difference in the deliberations, the late notice of this alleged language problem, the post-trial interviews which I submit do go towards undermining this notion of presuming that the jury follows instructions. I think that's pretty significant. I mean, because that shows that they didn't follow that very important instruction of disregarding previously formulated opinions and truly starting their deliberations anew. And this reconstituted jury, they had to go through the same evidence and the same amount of days of trial and all of that that the first jury had to go through. So it makes perfect sense. Those post-trial interviews make perfect sense as to explaining that big-time differential. I mean, if all they did was fill in the blanks or solidify their opinions or, you know, my mind's made up, let's streamline this so we can get home. Or, as Justice Deloitte said, or if they didn't have to explain something three times because not everybody understood English, that could have cut down on the time as well. I mean, you see, we can find reasons why there was a time difference. So other than the time difference, I'm asking you, and you're going through the list, but I wouldn't hang my hat completely on the time difference if I were you. No, but again, I'm also putting a lot of stock in, again, the fact that these affidavits show, or not affidavits, but the interviews show that they didn't follow the instructions. And again, we're not using the interviews to impeach the verdict. We're using the interviews to undermine this presumption in the that they followed instructions. In other words, we're using it to show the prejudice from the pre-verdict jury alternate process. And real quickly, in case you don't think I addressed it, as far as remedy goes, we're asking for a new trial. Because this trial should have been declared, and this jury replacement process was sufficiently prejudicial. There are no other questions? You stand on your brief on the other issue. I do, I do. So with that, I ask that this conviction be reversed outright, or in the alternative, reversed and remanded for a new trial. Thank you, Mr. Gonzalez. Thanks, Counsel. Good morning, Your Honors. Good morning. My name is Miles Kelleher, on behalf of the people. Good morning, Mr. Kelleher. The trial court properly exercised its discretion when it replaced Juror Chacon with the alternate Juror Boone. And the replacement procedure here did not prejudice the defendant. The trial court carefully reviewed the matter and took significant precautions to ensure that the defendant would not be prejudiced. And what were those precautions? First of all, the trial court wanted to make sure that this was simply a language problem and nothing else going on. Tell me what the precautions were that you say the trial court took careful precautions to see that this was, what were the, what were the precautions as you see them, that the court took? First of all, after receiving a note from the the, one of the jurors was having a language problem and they wanted guidance from the court. At that point, the trial court called out the foreperson, Ms. Laverne, and asked her about the problem. Ms. Laverne explained that one of the jurors, Olga Chacon, was having a language barrier problem. At that point, the court called out Ms. Chacon and asked her about the problem and asked her a number of problems to make sure that it was only a language barrier problem and not something else. The trial judge wanted to make sure that this wasn't a type of situation where something else might be going on, where, you know, she was somehow being pressured off the juror. And the judge, by his comments, made clear that there was nothing else going on. He found out from Ms. Chacon that her native language was Spanish and she didn't understand English a hundred percent and she had difficulty during the trial understanding what was going on. And it was apparent during the deliberations, too, based on a note from the jury and based on the conversation that the judge had with the foreperson, that she was also having problems participating in the deliberations. But as your opponent points out, Mr. Kelleher, the trial was three days and the juror had sat through three days of trial and they had been in the jury deliberation process for over three hours at that time. So I guess what Mr. Gonzalez is questioning is why did this language problem suddenly manifest itself and isn't that suspicious? Well, it's not clear that the language problem suddenly manifested itself, as Justice DeLorte noted. Perhaps some of the three and a half hours was the result of the jury having this problem with this juror. And finally, at some point, they decided, before we continue our deliberations, we need to get some guidance from the trial court as to how to proceed, because they were obviously having a problem with this juror, the language problem. It was only a language problem. And then once the court did find that there was a sufficient basis to excuse this juror, before the court allowed the alternate, Ms. Boone, to serve on the juror, the court questioned Ms. Boone to ensure that she had maintained her impartiality. The court asked her whether or not she had followed the court's instructions and she indicated that she had. The court asked Ms. Boone if she had talked to anybody about the case. Ms. Boone indicated that she had not. The court asked her if she had formed any opinions about the case. Ms. Boone indicated that she had not. And the court also asked Ms. Boone if she had been subjected to any outside influences regarding the case. And Ms. Boone indicated that she had not. Only at that point, once the court was satisfied that Ms. Boone was, had not in any way, her ability to serve on the court had been, jury had been impeded. At that point, the court instructed all the jurors, 11 original jurors and the alternate jurors, and this was pursuant to the defendant's request, instructed the jury that they were to begin their deliberations anew. That means that they were to totally disregard any and all deliberations that they had engaged in prior to that point, as well as abandon any and all opinions that they had formed during their deliberations, and they were to start from the beginning. And the judge really wanted to make sure that the jury understood this. So he said, okay. He gave the jurors a chance to respond. No one responded. He said, shall I read that again? Again, no one raised their hand or responded. He said the judge wanted to make sure that this reconstituted juror understood these instructions, that they were to begin their deliberations anew, and abandon any opinions that they had. Only at that point. I think we, Mr. Kelleher, I think we will all agree that the judge did what he was supposed to do in instructing the jury as a whole once they were reconstituted. One argument that Mr. Gonzalez made is all of that is all well and good, but it's, there is still prejudice because of the, you know, the factors that he listed. And in his briefs, he didn't argue this here, but I'm going to ask you about it anyway, because he'll get to respond. In his brief, one of the things he talked about is, given the, he thinks the state's evidence is very weak, you know, they have a reasonable doubt argument as well. Given the weakness of this argument, why push this through? Why not just start all over? The weakness of this evidence, rather. Why not just start all over? I mean, that's, that's, that's the argument that he's making, that the state really only had one main witness, and that witness that had some motive to, you know, fabricate his testimony. And given all of that, why not just recognize that everything here points to the fact that the defendant may have been the substitution of this juror so late in the process? Why not give the defendant a clean, fair opportunity in a new trial? That's his argument. And I'm asking you to respond to the question about the state's evidence, because that basically is the crux of what he's saying. He probably wouldn't care about all of this if he thought the argument, the evidence was so overwhelming it wouldn't make any difference anyway. But his argument is evidence was weak, and coupled with this juror irregularity, the defendant wasn't given a fair opportunity. How do you respond to that? Well, the state's response is that the, the evidence was strong here, and I could get into the specifics of that if the Court wants me to. Maybe in the course of doing that, I mean, there seems to circle around two main witnesses, and both, either one or both of them just talk about the shadow as being the shooter. And then I think that's where the appellate defender is coming from, that, you know, bias and prejudice and who's in what game decide that that wasn't enough to convict. Well, here, when you look at all the evidence, the direct evidence and the circumstantial evidence, there is clearly sufficient evidence for a rational trial matter of fact to find the essential elements of this offense beyond a reasonable doubt. We had a gang-motivated shooting where the defendant met some of his fellow gang members in a park shortly before the offense. He, the defendant was a member of the Satan Deciphal Gang. There was a rival gang in the area of 37th and Marshfield called the Latin Counts. We don't have the record. What I'd like you to do is focus in on what Justice DeLorte asked you about, because I'd like you to talk about the sufficiency of your evidence. Well, beforehand, you had statements of the defendant saying, let's go see if the clowns were out. This was a derogatory term for the Latin Counts, and Ballack interpreted that to mean, let's go beat them up or let's go shoot at them. And then they get into the yellow car, which belonged to Ballack. The defendant was in the front passenger seat. When they get to the area of 37th and Marshfield... We know the facts, Mr. Kelleher. What I'd like you to do to make it easier for you, I mean, just kind of bullet point for us, like those things that you think really punch home the fact that the state really had this guy, and this was the right guy, and here's the evidence, and these are the points that really prove it. I know that's asking you to encapsulate, you know, three days of trial, but that's what happens in the appellate court, unfortunately. So if you could do that, that would be helpful. Sure. You had... When the defendant got out of the car, Ballack testified that he had a gun in his hand. He was saying, I'm going to do it. I'm going to do it. After the shooting occurs, the police recovered a gun in an apartment building about four-tenths away from the crime scene. But that gun was never tied to the defendant, was it? The gun was tied to the bullet that was found in the victim's body and also... No, but was the gun tied to the defendant? That's... I mean, we're still trying to figure out. My question still goes to the sufficiency of the evidence in identifying and convicting this defendant. There's no question that the gun was found in the space heater in that apartment that the defendant's gang frequented and used. But I recall that it was never found with any fingerprints of the defendant. It wasn't tied to the defendant, per se, in any way. And nobody testified that they saw the defendant hide the gun there, did they? Well, this was... The gun was hidden in a location. It was a vacant apartment that the Satan disciples used as a party house. Right, but it wasn't just the defendant. All those Satan disciples or whoever they were used that. So it couldn't have been any one of them that hid the gun there, right? Well, there was also a bicycle that Patricia Berryman kept at that same building. And when the defendant shows up later... He was riding Patricia's bicycle, but how does that tie him to the gun? Reasonable inferences, based on all this evidence, indicate that after the shooting, there were two things the defendant wanted to do. One, he had to hide the gun somewhere. And two, he had to get back to Jeanette's bar to meet up with his cohorts. So one can reasonably infer from the evidence that he went to this apartment building that was about four-tenths of a mile nearby, hid the gun, and then since Valak refused to pick defendant up and drive him back because he didn't want to be part of this shooting, defendant took the bike that was in the lobby of the building, rode back to Jeanette's bar. And that's why when he gets to Jeanette's bar, he's all sweaty, he's tired, he has no shirt on, and he's mad. He kicks the bike and he says, why didn't you pick me up? So when you look at all this evidence, obviously he didn't... that wasn't his desired way of getting back to the bar. He did that out of what he felt was necessity, because he had to figure out a way to get there. That still doesn't tell me how that ties him to the gun. I think there is an inference, as you say, that's one inference, but there are many other inferences that can be drawn about how that gun came to be in that location. That's the... that was the hangout for that gang. And I don't think there was any doubt that there was more than one of those gang members that had access to that vacant apartment. Well, there doesn't have to be direct evidence tying to him. There can be... the law allows... it's perfectly fine to have circumstantial evidence. That's something... Well, clearly, because that's what this case was. Yes. This case was mainly circumstantial evidence, wouldn't you say? Well, there was quite a bit of direct evidence. A gunshot residue test was taken on defendant shortly after the... Yeah, but it was also found on Valak. They also found gunshot shot residue on Valak's hands, too. Nobody ever explained that. Actually, Robert Burke explained that. He was the trace evidence expert. He indicated that there were higher levels of barium and antimony on defendant than on Valak. And... and Robert Burke explained that if someone has gunshot residue on their hand, comes in contact with another individual, some of those elements can be transferred from one hand to another. And we don't know exactly what happened here, but it's... we do know that Valak... That's what Mr. Gonzales said. That's basically his argument, that the states really doesn't know exactly what happened here, and they basically are putting on evidence that's not sufficient, but they've convicted the saying. So, he's agreeing with you on that point, that you really don't know what happened here, especially... I think you were talking about the... the trace on Valak's hand, correct? Yes, I'm not talking about the entire case. Yes, Your Honor. I'm talking about... we don't know exactly, as far as how the barium and antimony, the lesser amounts, got on Valak's hands. We do know what happened as far as the whole offense. We... there's clearly sufficient evidence here, and Robert Burke testified that, you know, he not... he not only looks at the elements themselves, he looks at the ratios of them, and he was confident, he's an expert, that it was consistent with discharging, handling, and being in close proximity to a firearm. So, this is an expert who examined these elements that were found on the defendant's hands, and concluded that he had fired, or been in close proximity, to the firing of the gun. Now, whether Valak was involved also, well, first of all, he pled guilty, and two, there... in many of these cases, there's more than one person guilty. They may be accountable for each other's actions, so... Was there anybody else in the car besides Valak and the defendant? There was another individual named Alfredo Martinez in the backseat, but he... the gunshot residue was only found on defendant's hands and Valak's hands. So, when you look at all the circumstantial evidence here, it... a rational tire effect could have clearly found the essential elements of the offense here, and concluded that defendant, because he had... because of his gang membership, the way he said, let's go see if the clowns are out, it's a derogatory term referring to the Latin clowns that were in the area of 37th and Marshfield. The fact that he drove over there with Valak, he gets out of the yellow car with... with a gun in his hand saying, I'm going to do it. Shortly thereafter, five or six gunshots are fired. The gun is recovered from a building where the Latin clowns hang out. It's the same building where defendant takes Patricia Berryman's bike, rides over to Jeanette's bar, where... where the bike is recovered close... closely nearby. It all fits a... a reasonable inference where the jury can figure out, put all the pieces together, and figure out how this offense occurred, and how the defendant was directly involved. Regardless of Valak's involvement, again, he pled guilty. So, we have a situation where it's not unusual where more than one member of a gang in a gang-related shooting is involved in it, can be accountable for each other's actions. I would like to just go back to the alternate jury question for a moment. Okay, please try to wrap up, Mr. Keller. I'd just like to address the couple points defendant made about the post-trial interviews. As the trial court noted, those interviews were improper for a number of reasons. First, they were simply vague representations. The defendant didn't provide any affidavits or any sworn statements from these jurors. Also, it's quite clear the Illinois Supreme Court has clearly stated that evidence is inadmissible if it relates to the deliberative process of a jury, and you can't impeach a jury verdict by testimony of jurors. And here, even if this court were to look at those statements, they're insufficient as a matter of law to show prejudice. The statements indicate that each juror believed that he or she was beginning their deliberations anew. And as far as the time frame, first of all, the three and a half hours originally, some of that delay could have been attributable to the language problem, and also the hour and 41 minutes that the jury deliberated after the reconstituted jury, that actually demonstrates that the jury took the trial court's admonishments very seriously and did begin their deliberations anew. An hour and 41 minutes is a substantial period of time that allows for the jury to engage in meaningful deliberations. It would have allowed for the alternate juror, Chaconne, to have ample time to And this isn't a situation where the jury comes back 10 minutes later. This is an hour and 41 minutes, and that's a significant period of time. So to suggest that that somehow indicates that the jury didn't follow the trial court's instructions is complete speculation. The jury is presumed to follow the trial court's There's absolutely no evidence here to indicate that they didn't do that in this case. What about the fact that the trial judge, in effect, relied on the foreperson and the deputy sheriff to admonish the jury prior to the arrival of the alternate juror, and during the process of ordearing the Well, there's no rule that says that the trial court had to call out the jury and admonish them in court to stop their deliberations, but there are, and it is, the trial court can use the deputy sheriff to provide simple instructions to the jury. Obviously not instructions on the law, but just simple instructions as to when to begin their deliberations or stop their deliberations. But here, there was ample evidence in the record indicating that the jury had stopped their deliberations. The foreperson, the trial court said, if we call out Ms. Chacon, please stop deliberating at that point. And when the trial court brought out Ms. Chacon, the judge said, and tell everyone to stop deliberating. Also, after excusing Ms. Chacon, the court noted that they would be contacting alternate juror Boone, and the judge said, tell the jury to stop deliberating and wait for the jury to show up. And the trial judge even said at one point, any objection to the jury being taken out for a walk while they're not deliberating to go outside, and neither party objected. So when the record is looked, read as a whole, it's clear that the jury did not continue their deliberations while they were waiting for the alternate juror Boone to show up. In fact, it looks like the judge allowed them to go outside, get some air. So to suggest otherwise is speculating based on it's not supported by what's in the record. And it was only once the juror was, alternate Boone showed up and the judge was satisfied that she was, she had remained impartial that the jury was admonished to begin their deliberations anew. The judge didn't say continue your deliberations. The judge said begin them anew. It was clear that the jury had, had stopped their deliberations when the record is examined as a whole. Thank you, counsel. For all these reasons, as well as those stated in our brief, the people respectfully request that this honorable court affirm defendant's  and attempt murder. Thank you. Mr. Gonzalez? Brief rebuttal, please. Thank you. Well, Carol Adams maintains that the record is not that clear, that the jury in fact stopped deliberating. As Justice Rocha observed, that there doesn't, the record doesn't really reveal that the judge specifically instructed the jury to stop deliberating. All that's noted on there is somebody tell the jury to stop deliberating. There's no indication as to whom that directive was given. Certainly no indication that the judge himself admonished this jury. As far as the jury going out for air, well, okay, they went out for air. That doesn't mean that they don't formulate opinions and share it or whatever. That doesn't rely on anything. There's, the bottom line is that there's no indication that this jury was instructed to stop deliberating. With respect to what they were instructed when the new jury was acknowledged that it was instructed, our point is that these post-jury interviews definitely belie that, that they actually followed those instructions. Now, you know, whether it's an interview or an affidavit, well, the affidavit, you'd be arguing that I was trying to impeach the verdict. And our position is that, well, no, we're relying on these interviews to show that specific directions weren't followed and therefore the prejudice. And speaking of prejudice, getting to some of your questions about the sufficiency of the evidence, if this court were to call it in its first opinion regarding, you know, the first trial, you know, basically what we're left here without Valak, and we have the same kind of hodgepodge patchwork of circumstantial evidence that just amounts to nothing when you add it all up. I mean, this thing about the gun, again, as you pointed out, Justice Cunningham, I mean, it was recovered in an apartment that everyone agrees this was a gang hangout. There was absolutely no connection tying that gun to this defendant. As far as the gunshot residue, well, okay, we can explain or the expert can talk about matters of degree and all of that, but the bottom line is that the gunshot residue that was found on Valak is just inexplicable. It wasn't explained. At least with Karolales, we know his work as an auto mechanic certainly explains some elevated levels of lead and all of that. That's not exactly true. Didn't the expert say that the gunshot residue could come from environmental factors? I think in the state's brief they talked about if Valak and Karolales touched or shook hands or when he arrived at the apartment that the gunshot residue could be exchanged in that way and that would explain the smaller amount that was found on Valak versus Karolales. Well, he can certainly opine, you know, as far as the environmental factors, certainly the expert can opine to that. I guess it comes to a question of reasonableness and I guess when we add on to the other factors that I discussed in the brief in terms of why Valak should be just discounted altogether. I think what's even more significant is, again, we have a time frame between when the shooting actually took place, which was around 1.30ish, somewhere between 1 and 1.30, then we have all this unaccounted-for time. It seems to be about at least 45 minutes to an hour, perhaps slightly more, of where Valak had the same opportunity. He supposedly took his car home, but he wasn't accounted for for this significant period of time, which of course in our position as Valak was probably the shooter. I guess at the end of the day, when you add his testimony to the mix, we still have the same bundle of mess and non-proof that we had after the first trial. All they did was throw Valak into the mix. Well, we know someone was shot. We know that. You're saying that your version of the story is Valak was the shooter, but Valak was a witness in this case. He obviously testified he wasn't the shooter. Now whether that was true or false is another story. But wasn't his testimony to that effect subject to the scrutiny of examination and cross-examination and that went to the jury and they used that in their calculus? How can we second guess that at this point? Well, I guess it's not a matter of second guessing. It boils down to the reasonableness of the testimony, the principles in terms of taking those state's evidence in its best light and as to what rational conclusions can be reached. You know, I make all the arguments as far as why it's no rational jury could, you know, certainly by Talavera's testimony with regard to how inebriated and all that stuff. But I mean, with respect to Valak, you know, we have all of his, I mean, he comes out and says how he's, you know, ingratiating himself and trying to get a better deal and trying to make his life easier and all of that. At some point, it just doesn't seem reasonable to subscribe to anything he says. I guess that's our point. And I guess tying it into the second issue as to where the prejudice lies, certainly that has to factor into it. And then just as a final point, just to wrap up, there was this, State's attorney talks about what the court asked, but again, doesn't really expound on or amplify anything beyond just, well, the court asked if there was a language problem. I mean, I guess that's our point was that the court didn't ask or delve into this alleged language problem any further. And so when we have that coupled with the post-trial admissions as far as not starting anew. One final point that just reminded me of, State's attorney mentioned that an hour and 41 minutes is, you know, a reasonable amount of time to deliberate or, you know, somehow it suggests that the court followed the instructions and we maintain that that may be true in some cases, but that certainly doesn't hold much water when you're talking about a reconstituted jury who's called upon to look at the same bundle of evidence, the same host of things that a previous jury spent about three hours, three and a half hours on without reaching any kind of verdict. So I just think that doesn't sound, it seems a little far-fetched, at least in this particular set of circumstances. So unless there are any other questions, we just maintain that. Chirology conviction should be reversed outright or in the alternative remedy for the trial. Thank you very much, Mr. Gonzales. Thank you both. And this matter will be taken under advisement. Court stands adjourned.